# In the United States Court of Federal Claims

No. 13-684 C

(Filed March 27, 2014)

| | |
|---|---|
| ALLEN ENGINEERING CONTRACTOR, INC., | ) ) ) Construction Contract; Fraudulent |
| Plaintiff, | ) Performance and Payment Bonds; Prior |
| v. | ) Material Breach; Violation of |
| | ) Regulations; Default Terminations; |
| THE UNITED STATES, | ) Equitable Estoppel. |
| Defendant. | ) |

*William L. Bruckner*, Bruckner Law Firm, San Diego, California for plaintiff.

*Eric E. Laufgraben*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, *Donald E. Kinner*, Assistant Director, for defendant. *Stephen Tobin*, of counsel.

## ORDER

**Merow**, *Senior Judge*

In its complaint, plaintiff alleges that the government, under several theories of liability, improperly terminated a contract between the parties involving construction work at Marine Corps Base, Camp Pendleton, California. *See* Doc. 1. The government has moved the court to dismiss the complaint in its entirety, arguing that plaintiff has failed to state any claim on which relief may be granted. *See* Doc. 7. The court finds as follows.

## I.   FACTS

The parties executed a contract for construction work at Camp Pendleton on July 29, 2012. *See* Doc. 1, ¶ 4. Plaintiff provided the required performance and payment bonds from Liberty Mutual Insurance Company ("Liberty") to the Navy on August 20, 2012. *See id.*, ¶ 8. After initially rejecting the bonds, the Navy ultimately accepted them by letter dated September 6, 2012. *See id.*

On February 13, 2013, plaintiff submitted a second set of bonds, from Pacific Indemnity Company ("PIC"), and asked that if the PIC bonds were approved by the Navy, that they be substituted for the Liberty bonds. *See id.*, ¶ 9. Plaintiff acquired the PIC bonds from Individual Surety Group, LLC ("ISG"), a company which represented itself as a broker for PIC, a subsidiary of Chubb Group. *See id.*   Plaintiff alleges that upon receipt of the PIC bonds, the Navy began an investigation into whether the bonds were an acceptable substitute for the Liberty bonds. *See id.*, ¶ 11.

The Navy verbally confirmed the authenticity of the bonds by calling a man named Ed Campbell, who allegedly worked for PIC. *See id.*, ¶ 12.   Plaintiff believes that the Navy actually spoke to Eric Campbell, a purported representative of ISG. *See id.*, at n.3.   Plaintiff further believes that the Navy did not call the telephone number for PIC listed in the Treasury Circular 570. *See id.*, ¶13.   The Navy followed this verbal confirmation with a letter, dated March 14, 2013, requesting written confirmation that the PIC bonds were authentic. *See id*, ¶ 12. Plaintiff alleges that the Navy did not contact the proper person for authentication and that the Navy did not actually send the letter requesting written confirmation to PIC, in violation of its duty to do so under certain Navy regulations, Federal Acquisition regulations, and other federal laws. *See id.*

The Navy approved the PIC bonds and the Liberty bonds were returned to Liberty on April 10, 2013. *See id.*, ¶ 14.   In the complaint, Plaintiff alleges that the Navy sent the Liberty bonds back to Liberty, but Exhibit F to the same complaint indicates otherwise.   Liberty sent a letter to the Navy, dated May 2, 2013, stating: "Liberty's original performance and payment bonds for this contract (024039638), for which the new Pacific Indemnity bonds were substituted, have been returned to Allen Engineering Contractors, Inc., who has in turn forwarded the original bonds to Liberty." *Id.* at Exhibit F.   On May 2, 2013, Liberty notified PIC that the PIC bonds had been substituted for the Liberty bonds on the project. *See id.*, ¶ 15.   On May 6, 2013, Walter Maxwell of Chubb Group, informed plaintiff that the PIC bonds were not issued by PIC, and therefore, were invalid. *See id*.   The next day, May 7, 2013, PIC informed the Navy that the bonds were invalid. *See id.*, ¶ 15. And on May 8, 2013, the Navy sent a letter to plaintiff stating that the PIC bonds were fraudulent, and requesting that plaintiff provide replacement bonds. *See id.*, ¶ 16.

On May 20, 2013, the Navy suspended performance of the contract and requested that plaintiff provide valid replacement bonds. *See id.*, ¶ 17.   In response,

plaintiff explained that it was having trouble securing replacement bonds, *see id.*, Exhibit I at 2, and proposed alternatives to allow the project to move forward, *see id.*, ¶ 18.

The Navy issued a cure notice on June 11, 2013, giving plaintiff 10 days to provide valid bonds. *See id.*, ¶ 18 and Exhibit J. And on June 17, 2013, the Navy rejected plaintiff's alternative proposals, stating that the suggestions did not meet the FAR bonding requirements. *See id.*, ¶ 19 and Exhibit K.

The Navy then issued a show cause letter on June 24, 2013, giving plaintiff a final opportunity to provide additional information relating to its failure to provide replacement bonds. *See id.*, ¶ 20 and Exhibit L. Plaintiff responded to the show cause letter on July 3, 2013, and again proposed alternatives to providing replacement bonds. *See id.*, ¶ 20 and Exhibit M. On July 10, 2013, the Navy issued a notice of termination for default. *See id.*, ¶ 20 and Exhibit N. Plaintiff alleges that at the time of termination, the project was 40% complete. *See id.*, ¶ 20.

Plaintiff also attaches to its complaint a copy of a lawsuit filed by Chubb against Eric Campbell, ISG and others, relating to fraudulent bonds. *See id.*, ¶ 22 and Exhibit O. Although plaintiff argues in its response to the government's motion to dismiss that the Navy "was fully aware" of Eric Campbell's fraudulent activity, and was therefore in a position to protect plaintiff, *see* Doc. 10 at 19 and 29, the complaint does not make any such allegation and the attached exhibits do not supply such facts.

Plaintiff alleges that throughout the bonding process, the Navy violated a variety of its own regulations contained in the Naval Facilities Engineering Command ("NAVFAC") Contracting Manual (NAVFAC P-68) and several FAR provisions, including the following: (1) the contracting officer, Leilani J. Murray, was not a Level III contracting officer, as required by Navy regulations, and was therefore unauthorized to approve the new bonds, *see* Doc. 1, ¶ 22 (The paragraphs in the complaint are mis-numbered, and include two paragraphs 22. This reference is contained in the second such paragraph.); (2) the Navy failed to contact the correct representative from PIC to authenticate the bonds, *see id.*; (3) the Navy failed to notify the surety and principal of the effective date of the new bonds, *see id.*, ¶ 23; (4) the Navy unreasonably refused to accept plaintiff's alternative proposals, *see id.*, ¶¶ 24 and 27; (5) the Navy improperly terminated the contract because 48 C.F.R. § 52.249-10 does not permit termination for failure to provide replacement bonds, *see id.*, ¶¶ 25, 26, and 28.

## II.   ANALYSIS

The government has moved the court to dismiss plaintiff's complaint under Court of Federal Claims Rule 12(b)(6), on the basis that it fails to state a claim upon which relief could be granted.  *See* Doc. 7 at 1.  A complaint should be dismissed under Rule 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  To survive a motion to dismiss, a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, "[i]n ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff."  *Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 259 (2013).

Despite the fact that the complaint enumerates only one cause of action, in the papers submitted to the court, plaintiff makes five discernable arguments for recovery.  Three appear in the complaint:  (1) that the Navy violated a number of applicable regulations and committed a prior material breach by violating a duty it had to plaintiff in failing to properly investigate the validity of the PIC bonds and approve the substitution; (2) that the Navy improperly refused to accept plaintiff's alternative proposals to providing valid replacements for the fraudulent PIC bonds; and (3) that the Navy improperly terminated plaintiff's contract under FAR § 52.249-10, because this provision does not allow for termination for failure to provide replacement bonds.  And two are articulated in plaintiff's response to the motion to dismiss:  (1) that the Navy had both the "last clear chance" and the superior knowledge to save plaintiff from its predicament, *see* Doc. 10 at 17-20, and (2) that the Navy should be equitably estopped from terminating the contract, *see id.* at 28-30.  Although the last two arguments appear only in plaintiff's response to the government's motion to dismiss, they are purportedly based on facts that are either alleged in the complaint or in documents attached to the complaint.  The court, therefore, will address the sufficiency of each theory in turn.

### A.   The Navy's Investigation of Bond Validity was Inadequate and Approval of the Replacement Bonds was Improper

Plaintiff alleges that its failure to provide valid replacement bonds for the fraudulent PIC bonds should be excused because of the Navy's actions.  *See* Doc. 10 at 14-21.  Specifically, plaintiff claims that the Navy breached its obligations

under the contract and violated its own regulations and FAR provisions throughout the bonding process in the following respects:

>    (1)    the Navy failed to contact the correct representative from PIC to authenticate the bonds, as stated in Department of the Treasury Circular 570, in violation of 48 C.F.R. § 28.202 and NAVFAC P-68 ¶ 28.102-1(b),  which requires that the surety and not the bonding agent be contacted for authentication purposes;

>    (2)    the Navy violated 48 C.F.R. § 28.106-2(a) and NAVFAC P-68 ¶ 28.106-2 by allowing someone other than a Level III contracting officer authorize the substitute bonds; and

>    (3)    the Navy violated 48 C.F.R. § 28.106-2(b), by failing to notify the surety and principal of the effective date of the new bonds.

### 1.    Prior material breach

According to plaintiff, the Navy's failure to conduct an adequate investigation of the PIC bonds amounts to a prior material breach such that plaintiff "was excused from providing replacement payment and performance bonds when the NAVY returned the LIBERTY BONDS after accepting the PIC BONDS based upon a negligent and invalid investigation in violation of the CONTRACT, FAR, NAVFAC regulations and the purpose of the Miller Act." Doc. 10 at 21.

Under the doctrine of prior material breach, "[u]pon a material breach of a contract the non-breaching party has the right to discontinue performance of the contract." *Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 648 (2004) (citing *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1550 (Fed. Cir. 1992)).  In order for plaintiff to find shelter under this theory for its failure to provide replacement bonds, it must state a claim that the government breached a material term of the contract.  Plaintiff has failed to do so.

The only contract term that the plaintiff cites is the requirement that the contractor furnish payment and performance bonds "for Government review and approval."  *See* Doc. 10 at 16.  The plaintiff argues that:

>    Implied within Section 19 [of the contract] is the fact that a "review and approval" would take place by the NAVY undertaken in some

> standard, regulated method designed to, . . . serve the contractual and
> statutory bonding purpose of ". . . provid[ing] the Government with
> 'financial protection against losses under contracts,' and shield the
> Government from [risk] . . ."

*Id.* at 16 (citing the government's brief in support of its motion to dismiss). By plaintiff's own admission, this provision is an obligation imposed on *plaintiff* under the contract as a measure of protection for the *government*—not an obligation that the government had to protect the plaintiff.

In order to find some obligation in this provision that the government has allegedly breached, plaintiff essentially asks the court to incorporate, in their entirety, the provisions of the FAR, the NAVFAC P-68, and the Miller Act into the contract to supply content to the phrase "review and approval." Plaintiff offers no authority for such an incorporation, and the court declines to expand the contractual duties of the parties in such an extreme manner on the basis of the plaintiff's logic. And as the Federal Circuit has held, wholesale incorporation is inappropriate since not every provision of the FAR is meant for the benefit of contractors. *See Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000). Instead, "each regulation must be analyzed independently to determine whether it confers a cause of action upon the private contractor." *Id.*

### 2. Violation of regulations independent of contract terms

Plaintiff has likewise failed to state a claim for relief based on the Navy's alleged failure to abide by its internal regulations or the FAR, independent of the terms of the contract. As an initial matter, "[i]n order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor." *Id.* (citing *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997); *Rough Diamond Co. v. United States*, 173 Ct. Cl. 15, 22-26 (1965). As a corollary, if "the regulation exists for the benefit of the Government, then the private contractor does not have a cause of action against the Government in the event that a contracting officer fails to comply with the regulation." *Id.*

### a. Failure to contact the correct PIC representative

Plaintiff first argues that the Navy failed to contact the correct representative from PIC to authenticate the bonds, as identified in the Department of the Treasury Circular 570. *See* Doc. 1, ¶ 13. The Treasury Circular is referred to in both FAR §

28.202 and in NAVFAC P-68 ¶ 28.102-1(b).  In the complaint, plaintiff quotes FAR § 28.202(a)(1), which requires that sureties appear in Treasury Circular 570: "Corporate sureties offered for bonds furnished with contracts performed in the United States or its outlying areas must appear on the list contained in the Department of the Treasury Circular 570, 'Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and Acceptable Reinsuring Companies.'"  48 C.F.R. § 28.202(a)(1); *see* Doc. 1, ¶ 10.  Plaintiff then alleges that the contact information for each approved surety can be found in Treasury Circular 570.  *Id.*

Plaintiff also alleges that the Navy violated NAVFAC P-68 ¶ 28.102-1(b), which requires that the surety and not the bonding agent be contacted for authentication purposes:  "For contracts over $500,000, copies of the payment and performance bonds shall be forwarded to the surety (not the agent's office) for authentication.  A copy of this request to the surety shall be sent to the contractor."

To the extent that FAR § 28.202 affirmatively states any duty or required action on the part of the government, it requires only that the Navy made certain that the surety proposed by plaintiff appeared on Treasury Circular 570 as a condition of approving the bonds.  There is no dispute that PIC is, in fact, listed on the Circular.  *See* Doc. 1, Exhibit D (portions of Treasury Circular 570 attached to plaintiff's complaint, including an entry for PIC).  Thus, this section has not plausibly been violated.  Plaintiff has also alleged, however, that the Navy is liable as a result of improperly contacting the agent's office rather than the surety, in violation of NAVFAC P-68 ¶ 28.102-1(b).  *See* Doc. 1, ¶¶ 12-13.

Taking plaintiff's allegations as true, in order to make a valid claim for this failure, plaintiff must demonstrate that NAVFAC P-68 ¶ 28.102-1(b) was promulgated for its benefit.  As the government points out, the NAVFAC P-68 expressly states that it "provides general guidance to field contracting officers in the execution of their delegated authority," and that it "implements or supplements" the FAR, but "is not a stand-alone document."  *See* Doc. 12 at 7 (citing Doc. 10, Attachment 2 at A028).  This statement clearly shows that this document was designed for the benefit of government employees, not private contractors.  Furthermore, there is nothing in the text of the specific section to indicate otherwise.  The essential function of performance and payment bonds is to protect the government's interests and the interests of suppliers of labor and materials, respectively.  *See* 40 U.S.C. § 3131(b)(1) (stating that a "performance bond . . . [is] for the protection of the Government"); (b)(2) (stating that a "payment bond . . . [is] for the protection of all persons supplying labor and

material in carrying out the work provided for in the contract"). As such, ensuring that bonds are authentic logically serves the same interests. Because this regulation is evidently meant as a measure of protection for the Navy and for the suppliers engaged by plaintiff, but not to protect the plaintiff itself, plaintiff's claim for relief based on a violation of this section fails as a matter of law.

### b.   Failure to ensure substitute bonds authorized by a Level III contracting officer

Plaintiff next argues that the Navy is liable for its failure to abide by FAR § 28.106-2(a) and NAVFAC P-68 ¶ 28.106-2. *See* Doc. 1, ¶ 22. When read together, these regulations require that a Level III contracting officer authorize substitute bonds. *See* 48 C.F.R. 28.106–2(a) ("A new surety bond covering all or part of the obligations on a bond previously approved may be substituted for the original bond if approved by the head of the contracting activity, or as otherwise specified in agency regulation."); NAVFAC P-68 ¶ 28.106-2, Doc. 10, Attachment 2 at A030 ("A Level III contracting officer approval is required prior to substituting the original bond with a new surety bond covering all or part of the obligations on the previously approved bond.").

In the complaint, plaintiff alleges that Leilani J. Murray, the officer who approved substitution of the PIC bonds for the Liberty bonds, is not a Level III officer. *See* Doc. 1, ¶ 22. Even assuming Ms. Murray was not the proper person to review the bond substitution in this case, the cited regulations do not provide plaintiff with a basis for asserting the Navy's liability. As explained above, the bonds at issue were not required for plaintiff's protection, therefore, the court will not assume that the regulatory provisions dealing with the authentication or approval of the bonds were meant to protect plaintiff. Here, no specific language in the text of the regulations alters that conclusion. Plaintiff, therefore, cannot sustain a claim against the government on this theory.

### c.   Failure to notify the surety and principal of effective date of new bonds

Plaintiff further alleges that the government is liable for its failure to abide by the regulation that requires the government to "notify the principal and surety of the original bond of the effective date of the new bond," in cases of bond substitutions. 48 C.F.R. § 28.106–2(b); *see* Doc. 1, ¶ 23. The language of this regulation does suggest that it exists, at least in part, for plaintiff's benefit, since it required that the Navy provide notice to both plaintiff and Liberty of the effective

date of PIC substitution.  Assuming that to be the case, however, it appears from plaintiff's own filings that the Navy in fact provided the required notice.

Among the exhibits to plaintiff's complaint are two letters.  The first is a letter dated April 10, 2013, from the Navy to plaintiff copying PIC.  *See* Doc. 1, Exhibit E.  The letter states: "Receipt of performance and payment bonds numbered 02082013 is hereby acknowledged and approved.  The surety, Pacific Indemnity Company, has authenticated your performance and payment bonds and you may commence work."  *Id.*  The second letter, dated May 2, 2013, from Liberty to the Navy copying plaintiff and PIC, states in relevant part:  "Liberty Mutual Insurance Company is in receipt of your April 10, 2013 letter to Allen Engineering Contractor, Inc. confirming the Government's receipt and approval of substitute performance and payment bonds received from Pacific Indemnity Company (no. 02082013) . . ."  *See* Doc. 1, Exhibit F at 1.

The first letter clearly states that the PIC bonds have been approved as substitutes for the Liberty bonds.  And although the letter does not expressly contain the phrase "effective date," it is a small and reasonable inference that a letter dated April 10, 2013, that states the bonds have "hereby" been approved indicates effective approval as of April 10, 2013.  And, despite the fact that Liberty was not formally copied on the Navy's April 10, 2013 letter, it is evident from the May 2, 1013 letter it actually received a copy.  Thus, the Navy evidently met any obligations it had to notify plaintiff and Liberty under FAR § 28.106–2(b).

While it is true that the allegations in the complaint must generally be accepted as true for purposes of evaluating a motion to dismiss, "in the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed.R.Civ.P., the exhibit prevails."  *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).  Here, the exhibits to the complaint belie plaintiff's assertion that the Navy failed to provide proper notification.  As such, the facts as alleged do not support the theory that the Navy violated FAR § 28.106–2(b).

## B.    The Navy Improperly Refused Plaintiff's Alternative Proposals

In its complaint, plaintiff alleges that "[t]he Navy's actions in refusing to accept any one of multiple solutions that would allow the construction of RANGE 409 to move forward and satisfy the FAR requirements was unreasonable and a breach of the obligation of good faith and fair dealing."  Doc. 1, ¶ 24.  Plaintiff more specifically claims that the Navy "unreasonably declined" the tripartite

escrow agreement that plaintiff proposed, pursuant to FAR § 28.102-1(b)(1)(iii), and refused to hold Liberty or PIC as sureties.  Doc. 1, ¶ 27.

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005).  Specifically, "[t]he covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (citations omitted).  As the Federal Circuit recently explained:

> the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." . . . [O]ur formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.

*Metcalf Constr., Inc.   v. United States*, 742 F.3d 984, 991 (Feb. 11, 2014) (discussing application of the court's prior decision in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010)).  This duty applies to both private parties and the government.  *See Centex*, 395 F.3d at 1304.

Plaintiff's only basis for claiming that the Navy violated its duty of good faith and fair dealing is the general allegation that the Navy was unreasonable in refusing to accept plaintiff's alternative proposals to providing valid bonds to replace the fraudulent PIC bonds.  *See* Doc. 1, ¶¶ 24, 27.  In order for the Navy's decision to amount to a violation, plaintiff must show that it had a reasonable expectation that the government would agree to the alternatives.  But neither the complaint, nor the attached exhibits, make even a facially plausible claim that such an expectation was reasonable.

In two letters attached to the complaint, in which it expressly "agrees that the NAVY and subcontractors/suppliers have a right to be protected," Doc. 1,

Exhibit I at 5, Exhibit M at 6, plaintiff outlines three alternatives to the Navy's requirement that it provide valid bonds: (1) that the Navy hold Liberty accountable; (2) that the Navy hold PIC accountable; and (3) that the Navy accept an escrow agreement and notice of assignment in place of bonds. *See* Doc. 1, Exhibit I at 3-5, Exhibit M at 4-6.

Plaintiff claims that the Navy should have accepted its proposed escrow agreement, pursuant to FAR § 28.102-1(b)(1)(iii).   But, as the government correctly argues, escrow arrangements are only applicable to contracts valued between $30,000 and $150,000. *See id.*, Doc. 7 at 21.   In the complaint, plaintiff alleges that the value of the contract at issue here far exceeds that range—at $2,855,419.00. *See* Doc. 1, ¶ 5.   As such, plaintiff has no claim under this provision.

That leaves plaintiff with its claims that the Navy should take on the responsibility of holding either Liberty or PIC as sureties.   Plaintiff not only requested the bond substitution that resulted in its current predicament, but also actually returned the Liberty bonds to Liberty. *See* Doc. 1, ¶ 9, Exhibit F at 1. And it is undisputed that the PIC bonds were forgeries, Doc. 1, ¶¶ 15-16, thus PIC was never obligated as a surety on the contract.   Given these facts, plaintiff's position that the government could expect any protection from either set of bonds strains credulity.   The court simply cannot see how the Navy's decision that it needed more security than plaintiff's alternatives offered either alters the allocation of risks and benefits under the contract, or conflicts with the contract terms.

To the extent that plaintiff means to argue that the Navy acted unreasonably or contrary to law in refusing plaintiff's alternatives independent of the covenant of good faith and fair dealing, its argument is equally unavailing.   The Navy rejected plaintiff's proposals because they did "not comply with bonding requirements of FAR clause 52.228-15." Doc. 1, Exhibit K. *See also id.*, Exhibit L (reiterating plaintiff's failure to comply with FAR 52.228-15, and noting that plaintiff had "failed to cure the conditions endangering performance" under the contract); Exhibit N (terminating the contract for default due to plaintiff's failure to comply with FAR 52.228-15).   Section 52.228-15, in relevant part, requires that:

> Amount of required bonds.   Unless the resulting contract price is $150,000 or less, the successful offeror shall furnish performance and payment bonds to the Contracting Officer as follows:

(1) Performance bonds (Standard Form 25). The penal amount of performance bonds at the time of contract award shall be 100 percent of the original contract price.

(2) Payment Bonds (Standard Form 25-A). The penal amount of payment bonds at the time of contract award shall be 100 percent of the original contract price.

48 C.F.R. 52.228-15(b).   Plaintiff makes two excuses in the complaint for its failure to comply with this regulation.   First, it alleges that compliance with this provision after discovery of the fraud was unnecessary since it complied at the time the contract was executed by supplying the valid Liberty bonds.   *See* Doc. 1, ¶ 26. This argument is addressed in the following section, discussing proper termination for failure to maintain bonds under 48 C.F.R. § 52.249-10.   Second, plaintiff claims that its non-compliance should be excused because the Navy failed to properly investigate the validity of the PIC bonds.   *See id.*, ¶ 28.   As considered at length above, however, the investigation that plaintiff claims the Navy was required to do was not meant for plaintiff's benefit, and therefore cannot form the basis of a valid claim.

### C.   The Navy Improperly Terminated Plaintiff's Contract under 48 C.F.R. § 52.249-10

The applicable regulation governing default on fixed-price construction states:

If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

48 C.F.R. 52.249-10(a).   Here, the Navy terminated plaintiff's contract pursuant to this provision when plaintiff failed to provide replacements for the PIC bonds.   *See* Doc. 1, Exhibit N at 1 (stating that the contract "is terminated for default under the clause FAR 52.249-10 ("Default" [April 1984] [sic] effective immediately").   The termination notice further explains that "[t]his notice of termination for default is based upon AECI's inability to comply with FAR Clauses 52-228-15 [sic]

Performance and Payment Bonds—Construction and 52.228-2 (Additional Bond Security)." *Id.*

As quoted above, section 52.228-15 states that a contractor "shall" furnish payment and performance bonds on contracts with a value exceeding $150,000, and that those bonds must cover 100% of the contract price. 48 C.F.R. 52.228-15(b). Section 52.228-2 imposes a duty on the contractor to furnish additional bond security in specified circumstances, including when "[a]ny surety upon any bond, or issuing financial institution for other security, furnished with the contract becomes unacceptable to the Government." 48 C.F.R. 52.228-2(a).

Plaintiff alleges in the complaint that the language of FAR § 52.249-10 does not allow the Navy to terminate a contract based on the contractor's failure to maintain performance and payment bonds, and thus does not apply to this case. *See* Doc. 1, ¶ 25. In the event that FAR § 52.249-10 does apply to the case, according to plaintiff, its non-compliance should be excused due to the Navy's failure to adequately investigate the validity of the PIC bonds. *See* Doc. 1, ¶ 28. Plaintiff also alleges that because it offered to "furnish additional security" in the form of the tripartite escrow agreement, it did not violate FAR § 52.228-2. *See* Doc. 1. ¶ 27.

In its motion to dismiss, the government argues that termination was proper under FAR § 52.249-10, citing this court's decision in *Airport Industrial Park, Inc. v. United States*, 59 Fed. Cl. 332 (2004). In *Airport Industrial Park,* the contractor obtained performance and payment bonds from a company that became insolvent prior to conclusion of the contract work. *Id.* at 333. The government notified the contractor that it must provide replacement bonds, and when it failed to do so, the government terminated the contract for default. *Id.* at 334. The court held, based on a review of numerous cases and board decisions, that "failure to furnish adequate bonding required by a government procurement contract is a material breach that justifies termination for default." *Id.* *See also Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 647 (2004) (holding that the contractor materially breached the contract by failing to maintain bonding with an approved surety) (citing *Pac. Sunset Builders, Inc.*, ASBCA No. 39, 312, 93–3 B.C.A. (CCH) ¶ 25,923, 1993 WL 89769 (Mar. 17, 1993) (stating that when sureties became unacceptable to Government, appellant's failure to provide adequate financial information justified termination of contract for default) and *JaMar Constr. Co.*, ENG BCA No. 5251, 87–3 B.C.A. (CCH) ¶ 20,125, 1987 WL 41310 (Aug. 21, 1987) (finding a "material breach entitling the Government to

terminate the contract for default" when the contractor's surety went bankrupt and contractor could not obtain substitute bonding)).

These decisions, although not binding precedent, are clearly supported by the stated purpose of mandating bonds. The reason performance and payment bonds are required is to protect the government's interests and the interests of suppliers of labor and materials, respectively. *See* 40 U.S.C. § 3131(b)(1) (stating that a "performance bond . . . [is] for the protection of the Government"); (b)(2) (stating that a "payment bond . . . [is] for the protection of all persons supplying labor and material in carrying out the work provided for in the contract"). Allowing plaintiff to avoid default on the basis that it provided a valid bond at the time the contract was executed, notwithstanding the fact that the plaintiff requested that the Navy replace those valid bonds with bonds that later turned out to be fraudulent, would gut these statutory protections.

The conclusion that a contractor must maintain bonds throughout the contract term is also supported by a number of other FAR provisions. First, contractors cannot perform work without valid bonds. *See* 48 C.F.R. § 28.102-1(a) (stating that "The Miller Act (40 U.S.C. 3131 et seq.) requires performance and payment bonds for any construction contract exceeding $150,000"). Given the requirement that valid bonds are in place in order for a contractor to prosecute work under the contract, the lack of valid bonds would necessarily lead to the failure to prosecute work. Here, the Navy notified plaintiff on May 8, 2013 that the PIC bonds were fraudulent and must be replaced. *See* Doc. 1, Exhibit G. Shortly thereafter, because plaintiff failed to immediately provide replacement bonds, the Navy suspended work on the contract. *See id.*, Exhibit H. It was only after several more attempts to obtain valid bonds from plaintiff that the Navy actually terminated the contract. The failure to maintain the bonds or provide acceptable replacements, consequently, led to a direct violation of the express terms of FAR § 52.249-10(a).

In addition, section 52.228-2 requires a contractor to furnish additional bond security in specified circumstances, including when "[a]ny surety upon any bond, or issuing financial institution for other security, furnished with the contract becomes unacceptable to the Government." 48 C.F.R. 52.228-2(a). This is effectively a mechanism for ensuring adequate security is maintained throughout the contract term. Plaintiff's failure to provide additional security under this provision is, in part, the stated reason for the contract termination. Plaintiff's offer to provide an escrow agreement that is clearly unacceptable as security for

contracts exceeding $150,000, does not, as plaintiff alleges, amount to compliance with this provision.

Plaintiff offers no authority to support the proposition that a contractor is not required to maintain valid bonds throughout the term of the contract so long as it provides valid bonds at the beginning of the contract, and the force of logic weighs heavily against its position. And for the reasons previously explained, any negligence plaintiff perceives in the Navy's investigation of the validity of the bonds does not excuse its default under FAR § 52.249-10.

### D.   The Navy Had the "Last Clear Chance" to Keep Liberty Bonds in Force or the Superior Knowledge to Protect Plaintiff

In its response to the government's motion to dismiss, plaintiff argues, under two theories, that the Navy's superior knowledge imposed a duty on the Navy to protect the plaintiff. First, plaintiff alleges that it was left without valid bonds due to the Navy's refusal to demand that Liberty return the original bonds. *See* Doc. 10 at 18-19. Plaintiff claims that the Navy had the "last clear chance" to make such a demand based on Liberty's letter dated May 2, 2013. *See* Doc. 1, Exhibit F. In that letter, Liberty confirmed the bond substitution and stated that it had cancelled the original performance and payment bonds. *See id.* The portion of the letter that plaintiff apparently believes forms the basis of its argument is the final sentence, which reads: "Should you have any questions, comments or contrary understandings regarding the contents of this letter, please advise us within seven (7) days of the date of this letter," or by May 9, 2013. *Id.* Plaintiff was copied on this letter, and presumably received it at the same time the Navy did.

According to the allegations in the complaint, a Chubb representative first informed plaintiff that that PIC bonds were fraudulent on May 6, 2013. Doc. 1, ¶ 15. PIC then informed the Navy of the fraud on May 7, 2013. *See id.*

The last clear chance doctrine likely has a very limited application to cases involving government contracts. The doctrine is a defense to contributory negligence in which, typically, a negligent plaintiff must show elements similar to the following:

> (1) that the plaintiff was in a position of danger caused by the negligence of both plaintiff and defendant; (2) that the plaintiff was oblivious to the danger, or unable to extricate herself from the position of danger; (3) that the defendant was aware, or by the exercise of

reasonable care should have been aware, of the plaintiff's danger and
of her oblivion to it or her inability to extricate herself from it; and (4)
that the defendant, with means available to him, could have avoided
injuring the plaintiff after becoming aware of the danger and the
plaintiff's inability to extricate herself from it, but failed to do so.

*Johnson v. Washington Metro. Area Transit Auth.*, 98 F.3d 1423, 1425 (D.C. Cir.
1996) (citations omitted) (stating the test for the last clear chance doctrine under
the District of Columbia law).  Even if plaintiff could establish that the doctrine
should be considered in cases such as the one at bar, it certainly cannot show that it
was oblivious to the danger of being left without a valid bond.  In fact, based on
the allegations in the complaint, plaintiff knew of the impending danger before the
Navy did.

Plaintiff then raises the theoretically similar argument that the Navy knew
that Eric Campbell and ISG had previously submitted fraudulent PIC bonds, and
therefore had a duty to save plaintiff from itself.  *See* Doc. 10 at 19.  It cites the
"established rule" that:

while the [government] had no obligation to prevent (and, indeed, was
free to precipitate) the avalanche that buried the contractor, it was not
free, if it was aware of the impending avalanche and knew that [the
contractor] was not, to stand aside and let the bidder be overwhelmed
without a warning.

*J.A. Jones Const. Co. v. U. S.*, 390 F.2d 886, 888 (Ct. Cl. 1968).  Assuming,
however, that the Navy's superior knowledge would have imposed on it the duty to
protect the plaintiff, plaintiff has failed to adequately allege facts to support this
theory.  In the complaint, plaintiff alleges the existence of another lawsuit against
Eric Campbell and ISG for the same sort of behavior at issue here.  *See* Doc. 1,
¶22.  And that lawsuit does, in fact, mention the Navy.  *See* Doc. 1, Exhibit O at 7-
10, 18.

Plaintiff's argument in its response to the motion to dismiss, however,
promises far too much.  It claims that the lawsuit attached to the complaint
"indicates that the NAVY was fully aware as early as November, 2012 that Eric
Campbell, et al, was submitting fraudulent PIC BONDS to the NAVY."  *See* Doc.
10 at 19.  It does no such thing.  The complaint was filed by Federal Insurance
Company and Pacific Indemnity Company, and indicates no involvement or
relevant knowledge on the part of the Navy.  *See* Doc. 1, Exhibit O.  No certificate

or proof of service demonstrates that a copy of the complaint was served on the Navy. In short, the mere existence of a complaint that mentions the Navy, without more, is facially insufficient to establish the required knowledge that might impose a duty on the government to protect the plaintiff.

### E.   The Navy Should Be Equitably Estopped from Terminating the Contract

In its response to the government's motion to dismiss, plaintiff also alleges that the government should be equitably estopped from terminating the contract for default. *See* Doc. 10 at 28-30. In order to state a claim for equitable estoppel, the plaintiff must allege the following elements:

> (1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

*Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011) (quoting *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.,* 971 F.2d 732, 734 (Fed. Cir. 1992)). In addition, in order to invoke equitable estoppel against the government, plaintiff must allege affirmative misconduct. *See Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003) (citing *Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed. Cir. 2000).

Here, irrespective of whether plaintiff has alleged any other elements of equitable estoppel, it has failed to allege any affirmative misconduct on the part of the Navy. Plaintiff argues that the Navy's "negligent investigation, enhanced by the imputed knowledge of the NAS Pensacola PIC bonds, is the affirmative misconduct." *See* Doc. 10 at 29. As the court has already explained at length, plaintiff has not stated a claim that the Navy has violated any duty it had to plaintiff or any regulation that was meant for plaintiff's benefit in performing its investigation. And plaintiff has entirely failed to allege facts that support its statement that the Navy had any knowledge Eric Campbell's prior, allegedly fraudulent, activity. Plaintiff's equitable estoppel theory, therefore, fails.

## III.    CONCLUSION

For the foregoing reasons, the government's motion to dismiss, *see* Doc. 7, is hereby **GRANTED**, and plaintiff's motion for summary judgment, *see* Doc. 8, is **DISMISSED AS MOOT**.

**SO ORDERED.**

s/ James F. Merow
James F. Merow
Senior Judge